I concur in the result reached by the main opinion. I assume, without needing to decide, that the medical staff bylaws ("MSB"), upon their adoption by the board of directors ("the board") of Providence Hospital ("Providence"), created a mutually binding agreement between the medical staff of Providence and the board. I further assume, without needing to decide, that the actions taken by the board that are at issue in this case served to trigger the rights of Dr. Ken Ellingwood, Dr. Greg Cotter, and Dr. Rod Krentel ("the physicians") to the due-process procedures spelled out in the MSB. Providence contests both of those propositions, but my resolution of the physicians' ultimate issue on appeal obviates the necessity for a definitive resolution of those foundational issues.
The physicians' premises for those foundational issues proceed as follows: the preamble to the MSB states that the bylaws "when adopted by the board of directors, create a mutually binding agreement between the medical staff and the board of directors which may not be unilaterally amended." Article VII of the MSB, "Hearings and Appellate Reviews," provides that any member of the medical staff against whom certain "adverse actions" are recommended is entitled to the protection of specified hearing and appellate rights; among the adverse actions invoking such rights is the "involuntary reduction of current clinical privileges" of a member of the medical staff. Clinical privileges, in turn, are defined by the MSB as "the permission granted to medical staff members to provide patient care and includes access to those hospital resources including equipment, facilities and hospital personnel which are necessary to effectively exercise those privileges." A member of the medical staff affected by a recommendation of adverse action may request a hearing, with the result that the medical executive committee must appoint a fair-hearing panel. Following the hearing and the panel's decision, "either the member or the medical executive committee may request an appellate review." However, "[i]f . . . appellate review is not requested . . . [the] action or recommendation [of the fair-hearing panel] may be affirmed or denied by the board of directors as the final action provided the board limits its consideration to criteria related to quality of care and does not consider criteria unrelated to the criteria considered by the fair hearing panel."
The physicians contend in their brief to this Court that the board "violated both *Page 914 
restrictions," in that it "considered economic criteria, increased market share, etc., which are specifically in addition to and inconsistent with considerations of quality of care," and considered criteria unrelated to the criteria considered by the fair-hearing panel. Consulting the portions of the record to which the physicians cite in support of those charges, I do not find the record to contain substantial evidence to support the physicians' contentions. The physicians rely principally on the deposition testimony of Dr. Adrien Bodet III, a member of the board, asserting in their brief that he "specifically testified that in making the ultimate decision to transfer the radiation oncology equipment, the Board considered all the materials and matters that had been previously presented to the board." A careful reading of the portions of Dr. Bodet's deposition testimony on which the physicians rely, in the context of the entire 130 pages of his deposition, does not bear out that contention. The physicians cite Dr. Bodet's affirmative answer to the following question: "Was the discussion of the dysfunctional relationship [between the medical oncology staff and the radiation oncology staff] true from the beginning of the process looking at the cancer program to the end?"; as well as his affirmative response to the question whether the fact that Dr. Cotter was treating referral patients at another facility was "a concern throughout the entire process," with regard to whether there should be an exclusive radiation provider at Providence. Similarly, the physicians point to Dr. Bodet's affirmative answer to the question whether it "was a goal [of the hospital administration] at the beginning of the process and a goal at the end of the process" to provide for a radiation oncologist who would practice exclusively at Providence.
When considered in context, "the process" referenced by the questions was the approximately two-year process during which the hospital administration and the board, with the assistance of its consultant, Cancer CarePoint, were studying the oncology program at Providence. The references in the questions, taken in proper context, cannot be construed to extend beyond that "process," so as to encompass the May 25, 2001, review by the board of the record compiled before the fair-hearing panel and the panel's decision.
Also and lastly, the physicians reference in their brief to this Court the following deposition exchange between their attorney and Dr. Bodet, concerning the May 25, 2001, board meeting and the resulting resolution denying the decision of the fair-hearing panel:
 "Q. . . . One of the issues discussed there was the question of affirming or denying the decision of the fair hearing panel?
 "A. Yes.
 "Q. And you were present at that meeting?
 "A. Yes.
 "Q. . . . Feel free to read whatever, but I'm going to ask you about the first whereas clause on page two.
 "A. Okay.
 "Q. It says, `Whereas the decision by the Board to transfer the radiation oncology equipment to SMM' —
 "And that's Seton Medical Management; correct?
 "A. Correct.
 "Q. — `was not made without considerable deliberation.' You have to get through the double negative there. But what do you — was that discussed, that there was considerable deliberation prior to the decision to make the transfer? *Page 915 
 "A. We had been deliberating these issues for years. So considerable deliberation was given.
 "Q. And all of the issues that we have been talking about through the years were still present?
 "A. Pretty much.
 "Q. Were those issues discussed, any of those issues discussed?
 "A. You mean again specifically at that one meeting?
 "Q. Yes.
 "A. I don't recall.
 "Q. Okay.
 "A. But I think that the sense that was being offered here is that we've been trying to work through this for years.
 "Q. All right.
 "A. Much deliberation."
The main opinion sets out one of the preamble "whereas" clauses of the board's final resolution, and the "be it resolved" substantive portion of the resolution, but the above-quoted questioning of Dr. Bodet referenced another of the six "whereas" clauses, which, in turn, related back to the initial January 2001 decision of the board to transfer the oncology program to Seton Medical Management. Immediately following the "whereas" clause referenced by counsel in his above-quoted question to Dr. Bodet, is the "whereas" clause stating that "the decision by the Board [i.e., the January 2001 decision] was made after considering numerous alternatives over two and one-half years. . . ." Placed thus in context, Dr. Bodet's answers relate to the "considerable deliberation" leading up to that decision, and do not address the deliberative process undertaken at the May 25, 2001, special board meeting. In fact, another of the whereas clauses preceding the "be it resolved" text of the resolution expressly acknowledges that no appellate review having been requested, the MSB provided that the action or decision of the fair-hearing panel "`may be affirmed or denied by the Board provided the Board limits its consideration to criteria relating to quality of care and does not consider criteria unrelated to criteria considered by the Fair Hearing Panel'. . . ."
Accordingly, I cannot agree with the conclusion drawn by the physicians in their brief that Dr. Bodet testified that "in making the ultimate decision," i.e., the May 25, 2001, decision, the board considered, for the purposes of making that decision, matters prohibited by the provisions of the MSB governing review of an action or decision of a fair-hearing panel.
Although the physicians argue that the board considered "economic factors" not related to quality of care in reaching its final decision, I do not find that argument persuasive. The physicians point out in their brief to this Court that Providence is accredited by the Joint Commission on Accreditation of HealthCare and Providence points out in its brief that the Joint Commission defines "quality of care" as follows:
 "The degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge. Dimensions of performance include the following: patient perspective issues; safety of the care environment; and accessibility, appropriateness, continuity, effectiveness, efficacy, efficiency, and timeliness of care."
The physicians' own expert on medical-staff bylaws conceded that some economic issues are subsumed within the definition of "quality of care" and that the economic viability or vitality of a hospital could have a direct bearing on the quality of care that the hospital could offer. Thus, the term "quality of care," under the record compiled in this case, is broad enough to encompass *Page 916 
many factors, some of which have economic implications as they relate to the ability of the hospital to deliver, and the efficiency of the delivery of, patient-care services.
Having considered all of the portions of the record to which the physicians refer in arguing that the board failed to limit its consideration to criteria related to quality of care and criteria considered by the fair-hearing panel, in reaching the board's May 25, 2001, decision, I do not find substantial evidence creating a genuine issue of material fact on those issues. Accordingly, I cannot agree that the board violated the due-process rights of the physicians.
To the extent that this rationale proceeds beyond the terminus of the rationale expressed by the trial court in its summary judgment, such extrapolation is permissible. This Court can affirm a judgment of a trial court "if it is right for any reason supported by the record." Taylor v. Stevenson, 820 So.2d 810,814 (Ala. 2001).